492 F.2d 617
 160 U.S.App.D.C. 351
 TRANSAMERICAN TRAILER TRANSPORT, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, New York Shipping Association, Inc.,
and Walleniusrederiena, United Fruit
Company, Intervenors.
COMMONWEALTH OF PUERTO RICO, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, New York Shipping Association, Inc.,
Intervenor.
WOLFSBURGER TRANSPORT-GESELLSCHAFT, m.b.H., Petitioner
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents Walleniusrederiena ('Wallenius Line')
et al., Intervenors.
NEW YORK SHIPPING ASSOCIATION, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Commonwealth of Puerto Rico et al.,
Intervenors.
SEATRAIN LINES, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, New York Shipping Association, Inc.,
Intervenor.
SEA-LAND SERVICE, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, New York Shipping Association, Inc.,
Intervenor.
DANIELS & KENNEDY, INC., and the Madden Corporation, Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, New York Shipping Association, Inc.,
Intervenor.
 Nos. 24019, 24044, 24831, 72-1714, 72-1740, 72-1763, 72-1766.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Oct. 3, 1973.
Decided Jan. 28, 1974, Rehearing Denied Feb. 14, 1974.
 
 Ronald A. Capone, Washington, D.C., with whom Stuart S. Dye, Washington, D.C., was on the brief for petitioner in No. 24,019, also argued for petitioners in Nos. 72-1740 and 72-1763. Russell T. Weil, Washington, D.C., and John Williams entered appearances for petitioner in No. 24,019 and intervenor Transamerican Trailer Transport Inc., in Nos. 24,831 and 72-1714. Ronald A. Capone, Washington, D.C., also entered an appearance for intervenor Transamerican Trailer Transport, Inc.
 Mario F. Escudero, Washington, D.C., for petitioner in No. 24,044 also entered an appearance for intervenor, The Commonwealth of Puerto Rico, in Nos. 24,831 and 72-1714.
 Philip Elman, Washington, D.C., for petitioner in No. 24,831 also entered an appearance for intervenor Wolfsburger Transport-Gesellschaft, m.b.H. in No. 72-1714.
 C.P. Lambos, New York City, for petitioner in No. 72-1714. Wayne S. Bishop, Washington, D.C., entered an appearance for intervenor, New York Shipping Assn., Inc., in Nos. 24-019, 24,044, 72-1740, 72-1763 and 72-1766. Richard Brook, New York City, also entered an appearance for intervenor New York Shipping Assn., Inc., in No. 24,831.
 Joseph F. Delly, Jr., New York City, for petitioners in No. 72-1766 also entered an appearance for intervenors Daniels & Kennedy and The Madden Corp. in No. 72-1714. James A. Treanor, Washington, D.C., entered an appearance for petitioner in No. 72-1766.
 Carl D. Lawson, Atty., Dept. of Justice, for respondents. James L. Pimper, Gen. Counsel, Federal Maritime Commission, Edward G. Gruis, Deputy Gen. Counsel, Paul J. Fitzpatrick, Atty., Federal Maritime Commission, and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondent.
 Marvin J. Coles and Neal M. Mayer, Washington, D.C., were on the brief for petitioner in No. 72-1740. Neal M. Mayer, Washington, D.C., also entered an appearance for intervenor Seatrain Lines, Inc., in Nos. 24,831 and 72-1714.
 Gerald A. Malia, Washington, D.C., was on the brief for petitioner in No. 72-1763.
 Alan F. Wohlstetter, Washington, D.C., was on the brief for intervenor Walleniusrederiena in Nos. 24,019, 24,831 and 72-1714 and also entered an appearance for intervenor United Fruit Company in No. 24,019 and intervenor United Brands Company in No. 72-1714.
 Before WRIGHT, McGOWAN and WILKEY, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 These consolidated petitions to review orders of the Federal Maritime Commission, 28 U.S.C. 2342 (1966), have their origins in the modernization of shipping and loading facilities in the Port of New York. At issue here is the propriety of the Commission's approval, as modified by it, of the New York Shipping Association's assessment agreement T-2390. That agreement was designed to allocate some of the costs of a labor accord reached between the International Longshoremen's Association and NYSA, the latter acting on behalf of both member and non-member employers in the Port of New York.
 
 
 2
 NYSA is a multi-employer bargaining unit, comprised of ocean carriers, operators of vessels calling at the Port of New York, and contracting stevedores and other employer groups generally associated with loading, unloading, and handling of oceangoing ships and their cargoes. Some of the petitioners before this court are not members of NYSA. They are nonetheless directly affected by the allocation agreement because the cost of the membership assessment is reflected in their loading costs in the Port. They participated in the proceedings before the Commission, and clearly have standing to seek review in this court.
 
 
 3
 The diverse and contradictory positions advanced by petitioners reveal the difficulty of allocating the labor costs of a modernizing industry in a manner that satisfies all parties. The increased fringe benefit costs, in part a reflection of the union's concern that port modernization will lead to excessive job displacement, must be divided among a group of employers whose labor porductivity varies significantly. In this context, precise calculations are elusive, and absolute equity is beyond concrete demonstration. At best, the assessment agreement must represent a compromise of sorts. Cf. Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 293, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968) (Harlan, J., concurring). The Commission, itself a recent initiate to the complex problems presented by agreements of this kind, must exercise its statutory authority to assure that the agreements do not violate the mandates of the Shipping Act, 46 U.S.C. 801 et seq. (1964). This court must in turn determine whether the Commission has operated within its proper statutory powers and by rational reference to substantial evidence in the record before it. In this instance we are persuaded that it has; and we affirm.
 
 
 4
 * The assessment agreement is an attempt to allocate the costs of the modernization of port loading facilities.[1] This so-called 'containerization revolution' is characterized by the increasing use of more efficient methods of cargo handling in the maritime industry. Containerization has aroused the concern of the union, which looks upon these methods of cargo handling as a threat to job security. Thus, the rise of containerization was paralleled by a rise of labor unrest. Containerization began to affect Port of New York labor relations in the late fifties, and labor strife infested the Port throughout the decade of 1958-1968. The labor agreement with the union, which gave rise to T-2390, covered the years 1968-1971. It came at the end of a lengthy strike, and was itself but one more step in the battle over this issue.[2]
 
 1. The Evolution of T-2390
 
 5
 The NYSA membership unanimously ratified the labor contract with ILA which underlay T-2390, but with a general understanding among themselves that the Association would develop a formula that would cause a reallocation of the fringe benefit assessment to transfer some of the costs of the concessions from the less efficient breakbulk operators to the innovative carriers. At that point, however, unanimity ended; and the creation of an allocational formula that satisfies all parties has been a continuing source of dispute. T-2390, itself a compromise solution that was the product of repeated NYSA efforts,[3] was finally adopted by the NYSA membership by a vote of 58-3.
 
 
 6
 The purpose of T-2390 was to provide a means of financing the cost of fringe benefit concessions contained in the ILA agreement.[4] NYSA had previously allocated these kinds of costs by a formula that charged members on the basis of man-hours of labor employed. But the same modernization process that prompted the concession of new fringe benefits in the underlying ILA contract also necessitated the creation of a new method of assessing NYSA members. Although the previous allocational formula had worked fairly when most of the members utilized similar loading methods and had similar labor productivities, the man-hours formula began to impose an increasingly disproportionate burden on the traditional breakbulk cargo handlers as more employers turned to more innovative methods of cargo handling. NYSA therefore resolved to discontinue the old system. An assessment committee was created for the purpose of devising a new method of allocating these costs, and, after two previous attempts to reach an acceptable solution, supra note 3, the committee proposed T-2390.
 
 
 7
 Agreement T-2390 established a combined man-hour and tonnage formula for raising funds to pay for certain fringe benefit costs of the ILA contract. One part of the assessment, based exclusively on man-hours of labor employed, was designed to cover expenses remaining from the previous labor contract which expired in 1968. The second component of the formula levied assessments on the basis of a specified amount per ton of cargo. As the amount of total liability under the labor contract was only a prediction, allowance was made for the establishment of greater tonnage assessment if that became necessary to cover all costs.
 
 
 8
 2. Commission Modification of T-2390.
 
 
 9
 Prior to Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), it was widely believed that the Commission's jurisdiction did not extend to these assessment agreements. In Volkswagen the Court announced that Section 15 of the Shipping Act did confer jurisdiction over these agreements, and sopke in broad terms concerning the Commission's statutory responsibility to evaluate these pacts by reference to Sections 16 and 17 of the Act.
 
 
 10
 In this case, the Commission's role has been pervasive. T-2390 was twice considered by a Hearing Examiner and twice by the Commission. The former's initial consideration led him to conclude that T-2390 should be modified in two respects. First, he determined to grant 'excepted cargo' status to all northbound cargo from Puerto Rico.[5] Second, he lowered the NYSA assessment ratio on automobiles from the established level of 20% Of cubic measurement to 18%.[6]
 
 
 11
 The Commission, while accepting the Examiner's findings of fact, modified his conclusions on these issues by extending the 'excepted' status to include all Puerto Rican cargo, both north and southbound, and by restoring the initial NYSA assessment ratio of 20% For automobiles. Following proceedings prompted by NYSA's motion for reconsideration, the Hearing Examiner altered his conclusions and determined that T-2390 should be approved as originally submitted, thereby denying 'excepted' status to any Puerto Rican cargo and approving the NYSA automobile assessment of 20% That the Commission had endorsed in its first decision. Additionally, the Hearing Examiner considered for the first time the claims of the newsprint interests, and concluded that that cargo did not merit the special treatment afforded the 'excepted' cargoes.
 
 
 12
 In its second consideration of the questions, the Commission had before it both the Examiner's proceedings, findings, and conclusions, and the submitted proposals of the parties and of the Commission Hearing Counsel.[7] Again, the Commission adopted the Examiner's basic findings of fact but disagreed with his ultimate conclusions on the specific issues here in question. The Commission made three modifications of T-2390, each of which is challenged here. Two of the modifications relate respectively to the treatment of Puerto Rican cargo and newsprint. In each case, the Commission adopted an assessment formula that granted 'excepted' status as to some expenses but charged the cargoes for certain other expenses on a tonnage basis. Additionally, the Commission adopted a new method for assessing automobiles which resulted in a charge equivalent to approximately 10-12% Of cubic measurement under the previous assessment formula.
 
 
 13
 3. The Contentions in this Court.
 
 
 14
 At the outer extremes are NYSA, which asserts that the original agreement was proper and should not have been altered in any way; and the Government, which defends the Commission's modifications. On the single issue of the assessment of automobiles, petitioners Wolfsburger Transport Gesellschaft, m.b.H., and Walleniusrederiena support the final modification. The ultimate relief sought by the newsprint interests and the parties representing the Puerto Rican trade is the same, that is to say, each claims that the Commission erred in failing to grant its cargo full 'excepted' status for all expenses.
 
 II
 
 15
 Any evaluation of the Commission's actions must begin with Volkswagen, supra,-- the case which both launched the Commission into the business of passing upon these allocational agreements and defined the dimensions of its role in that process. Section 15 of the Shipping Act requires that certain agreements must be filed with the Commission, and makes it unlawful to carry out any part of those agreements in advance of Commission approval. Once approved, Section 15 immunizes the parties from antitrust liability. 46 U.S.C. 814. See generally Volkswagen, supra, at 271, 88 S.Ct. 929; American Union Transport v. United States, 103 U.S.App.D.C. 229, 257 F.2d 607, 610-611, cert. denied, 358 U.S. 828, 79 S.Ct. 46, 3 L.Ed.2d 67 (1958).
 
 
 16
 In granting antitrust immunity under Section 15, the Commission is charged with the responsibility of assuring that the agreements conform to the standards of Sections 16 and 17, which respectively prohibit subjecting 'any particular person, locality, or description of traffic . . . to any undue or unreasonable prejudice or disadvantage . . .,' 46 U.S.C. 815, and forbid any unjust or unreasonable regulation or practice relating to or connected with the receiving, handling, storing, or delivering of property, 46 U.S.C. 816. When the Commission finds that an agreement fails to satisfy the statutory standards, Section 15 authorizes the Commission to modify it in order to make it conform.
 
 
 17
 The record before us speaks eloquently of the difficulties of the task entrusted to the Commission, at least in relation to cost allocation agreements of this kind. As Justice Harlan observed in Volkswagen, supra,390 U.S. at 293, 88 S.Ct. at 946:
 
 
 18
 There (is) no 'perfect' way to apportion the costs. An analysis of the present problem must leave room for the implementation of some uniform, practical, general rule of assessment even though it have some features that are less desirable than some alternative imperfect rule.
 
 
 19
 The Supreme Court's recognition of the imprecise nature of the Commission's inquiry did not, however, prompt it to read narrowly the Commission's powers in this area. On the contrary, the Court indicated that the Commission's powers under Sections 16 and 17 are to be read expansively. In examining agreements under Section 16, Justice Harlan invited the Commission to inquire 'whether special treatment for this class of goods was necessary under the circumstances and, if so, whether the special rule adopted was the fairest that could be devised.' Id., at 294, 88 S.Ct. at 946. And, under Section 17, the Commission should relate the benefits received to the charges imposed with an eye toward determining 'whether the charge levied is reasonably related to the service rendered.'[8]
 
 
 20
 The nature and breadth of the Commission's inquiry suggests the appropriateness of the relatively detached standard of review that courts should afford the Commission when it is clear that the Commission is acting within the proper parameters of its statutory responsibility. As this court emphasized some time ago:
 
 
 21
 The (Commission) . . . (is) an expert in the field and . . . this court should not pit its view against (it). The great complexity of our economy induced Congress to place the regulation of businesses like foreign shipments in specialized agencies with broad powers. The courts are slow to interfere with the conclusions of such agencies when reconcilable with statutory directions.
 
 
 22
 American Union Transport v. United States, supra, 103 U.S.App.D.C. at 234, 257 F.2d at 612. And the Supreme Court, speaking to the propriety of the substantial evidence standard of review of administrative action, stated in Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966):
 
 
 23
 Congress was very deliberate in adopting this standard of review. It frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute.[9]
 
 
 24
 With the Commission's role, and our own, properly in mind, we turn to the particular contentions of the parties to this appeal.
 
 III
 
 25
 1. The Puerto Rican Trade Issue.
 
 
 26
 Probably the most hotly contested issue before both the Commission and this court is that of the treatment of Puerto Rican trade. NYSA chose to make no distinction for Puerto Rican trade, i.e., not to grant it the 'excepted cargo' status that was offered certain 'marginal' cargoes. See note 5, supra. The Commission considered the question on two occasions and twice found fault with the NYSA proposal.
 
 
 27
 The Commission's initial determination was to grant all Puerto Rican trade 'excepted cargo' status. On reconsideration, the Commission adopted the solution offered by its Hearing Counsel in the reopened proceedings. It assessed the Puerto Rican trade for certain 'industry' obligations, for which Puerto Rican cargo was as responsible as all other cargoes, in a manner that required that trade to pay a percentage of the total 'industry' expense that roughly corresponded with the trade's approximate share of the total tonnage volume in the Port of New York. The Commission continued to require that the Puerto Rican cargo be assessed on an 'excepted cargo' basis in respect of certain other costs for which its responsibility could not be so traced.
 
 
 28
 We have examined petitioners' procedural challenges and find them to be without merit. The contentions that no new evidence existed to support the reopening of the proceedings or the Commission's decision to alter its initial determination simply ignore the evidence that earlier cost estimates had been significantly in error, as well as the other matters set forth in the Commission's decision to reopen.[10] It is certainly within the Commission's province to redraw its conclusions in light of its more complete and accurate understanding of the underlying facts. Nor do we feel that the subjects considered in the reopened proceedings necessarily need be limited to matters adverted to in its decision to reopen where, as here, none of the parties complain of lack of notice and an opportunity to participate in the reopened proceedings. Finally, contentions that NYSA did not meet its 'burden' on reopening to demonstrate that the Commission's initial determination was erroneous likewise fail to recognize the nature of the Commission's inquiry, the substantial body of new evidence adduced in the reopened proceedings, and the latitude that courts must afford agencies that act rationally on the basis of substantial evidence on the record.[11]
 
 
 29
 A great number of issues raised by petitioners for the Puerto Rican interests essentially relate to the conclusions that the Commission derived from the evidence before it and to the sufficiency of the evidence on specific points. These petitioners repeatedly maintain, for example, that the Commission improperly characterized the benefits received by the Puerto Rican trade and therefore erred in concluding that the benefits received justified the imposition of the assessments that it ultimately approved. We have examined the record and the decisions of the Hearing Examiner and the Commission as they relate to the specific points raised by these petitioners, and we are convinced that substantial evidence exists on the record to support the Commission's determination not to grant the Puerto Rican trade a total 'excepted cargo' treatment for all of the fringe benefit costs of the ILA agreement.
 
 
 30
 Petitioners' repeated protestations that their trade had already modernized and therefore received no benefits-- the premise for many of their claims that providing 'excepted cargo' status was the only permissible result-- overlook the Hearing Examiner's extensive findings on the question of benefit, particularly those relating to the NYSA's successful blunting of union demands aimed against the containerized carriers in the 1968 negotiations. See, e.g., JA I, at 164-66; JA II, at 486-87, 496.
 
 
 31
 Petitioners for the Puerto Rican trade interests also attack the Commission's attempt to categorize the expenses, and to assess the Puerto Rican trade differently for different types of fringe benefit costs. They assert that the obligation for funding the guaranteed annual income expense is no different in kind from the obligation to pay for 'shortfall,' and that the Commission erred in establishing a different method of assessment for the former.[12] Petitioners raise other objections to the manner in which the Commission interpreted the evidence before it, and complain that the final Commission decision was simply a 'compromise for the sake of compromise.'
 
 
 32
 It is, of course, not a fatal flaw that the Commission's perception of the fairest allocation of the costs of the fringe benefit expenses creates an assessment that rests somewhere between the results advocated by the parties, so long as the Commission decision rests on substantial evidence. Most of the contentions advanced to this court were previously advanced to the Examiner and the Commission. What the parties request, in essence, is that we reverse the Commission on factual determinations. We have, however, examined the record and the decisions of the Examiner and the Commission, and have determined that the Commission's ultimate decision finds the support of substantial evidence in the record. That exhausts our function.
 
 
 33
 Finally, some of the petitioners assert that any exclusion of the Commonwealth of Puerto Rico from the 'excepted cargo' category effects an improper discrimination between Puerto Rican and other 'domestic' cargoes. In large part, this contention rests too heavily on the word 'domestic' and ignores the basic nature of the excepted category. As the records reveals, the 'excepted cargo' category was designed to encompass 'marginal' cargoes that might be diverted to other ports or other modes of transportation if burdened too heavily by the costs of the fringe benefit concessions in the labor agreement. Both the Hearing Examiner and the Commission properly focused on the essential nature of the excepted category rather than on the word 'domestic.' Under any standard of review, we find no error in that determination.
 
 
 34
 Although the result sought is diametrically opposite, some of the contentions of NYSA are similar to those raised by the petitions for the Puerto Rican trades. NYSA also quarrels with the Commission's decision to establish a different method for assessing the costs of 'shortfall' and guaranteed annual income, and disagrees with the Commission's evaluation of the nature of the benefits received by the Puerto Rican trade and the size of the assessment that the receipt of those benefits will support. It also asserts that the Commission's solution was simply a compromise. To those contentions our answer is the same.
 
 
 35
 Finally, both NYSA and the petitioners for the Puerto Rican trade also attack the manner in which the Commission chose to treat the Puerto Rican economy as a factor in its determination. The Commonwealth asserts that the unique nature of the Puerto Rican economy and its dependence on shipping should be critical, if not determinative, factors in the Commission's decision. NYSA, on the other hand, maintains that these factors should have no bearing whatsoever, and that the Commission's partial reliance on them was improper. The Commission and the Hearing Examiner consciously wrestled with these considerations and with the weight that they should receive in their determinations. The Examiner, after resting his first decision in part on the unique nature of the Puerto Rican economy, finally concluded that that fact should merit no weight whatsoever. The Commission, on the other hand, noted the peculiar status of the Puerto Rican economy and viewed it as a relevant factor in both of its decisions.
 
 
 36
 Assessment of the proper content to be given the mandate to protect the 'public interest' is an elusive undertaking that varies from one context to the next. As this court has noted: 'The same statutory phrase may have different meanings in different contexts, and the statutes agencies and court decisions are not necessarily fungible.'[13] The Commission had previously considered the unique dependence of the Puerto Rican economy on maritime trade in other contexts, and we are not convinced that it cannot also take note of that factor here, especially when the record so clearly reveals that this was but one of the number of factors considered in attempting to assess a very complex proposal and determine what was 'fair' and 'reasonable' under all of the circumstances. Thus, we reject NYSA's assertion that the Commission's consideration of the character of the Puerto Rican economy was improper. But neither are we persuaded by the Commonwealth's contention that this factor should be virtually dispositive. As the Commission noted, even the Commonwealth's economic witness properly conceded that Puerto Rico must be prepared to bear some fair share of the common burden. On this record, we cannot find that the Commission gave improper weight to this one of many factors that contributed to its ultimate result.
 
 
 37
 In sum, we have considered each of the many individual arguments that have been advanced in opposition to the Commission's resolution of the assessment for the Puerto Rican trade and found that none requires reversal of the Commission's decision. In a matter turning so heavily on 'a complex and hard-to-review mix of considerations,' Consolo, supra, 383 U.S., at 621, 86 S.Ct. 1027, as this one, we will not reverse the obviously considered opinion of the Commission when it finds support in a substantial body of the evidence of record.
 
 
 38
 2. The Newsprint Interests.
 
 
 39
 Treatment of the newsprint cargo was not at issue in the initial proceedings before the Examiner or the Commission. Petitioners Daniels & Kennedy, Inc. and the Madden Corporation did participate in the reopened proceedings, however, and they now assert to this court that the solution offered by the Commission imposed a disproportionately high burden in relation to the benefits received.
 
 
 40
 The Commission adopted the recommendation of the Hearing Counsel, which was to assess the newsprint cargo in the same manner as the Puerto Rican trade. The newsprint interests apparently considered that solution to be acceptable at one time. See JA II, at 527. But they now contend that they should be granted full 'excepted cargo' status or should be assessed by some formula that would equalize their proportionate increase in costs with that of the breakbulk carriers. NYSA, contrarily, argues that newsprint should receive no special treatment.
 
 
 41
 The Hearing Examiner's decision to deny any special treatment to newsprint cargo seems to have been based in large part on his conclusion that newsprint's assessment increase was the same dollar amount as that imposed on breakbulk, and that newsprint's high labor productivity made the assessment fair in comparison to other cargoes. The Commission, however, followed the recommendation of the Hearing Counsel on this issue. After finding that newsprint cargo was similar to 'excepted' cargoes in that it was both highly productive and noninnovative, the Commission determined that newsprint should not be granted full 'excepted cargo' status because it was not a 'marginal' cargo that would cease moving through New York if saddled with additional costs. See note 5, supra. The Commission then adopted the formula that isolated the specific costs of the labor contract that might properly be attributed to newsprint, and assessed it on the basis of its proportionate share of the total tonnage volume in the Port. It granted newsprint 'excepted' status for the expense of 'shortfall.'
 
 
 42
 Many of the positions pressed upon us by the newsprint interests were advanced before the Commission and rejected. Examination of the Commission's reasons and petitioners' challenges persuades us that its decision to reject those solutions finds adequate support in the record.
 
 
 43
 Petitioners maintain that the Commission should make no reference to the relative fairness of the assessments that existed prior to 1968. That seems to be an untenable proposition. The thrust of the newsprint interests' position is that their increase from the prior assessment levels is disproportionately greater than that suffered by some other cargoes. It therefore seems to us proper that the Commission should examine the fairness of the prior assessment, at least for the limited purpose of determining the validity of the basis of the comparison that newsprint has advanced. Obviously, if prior ratios were not 'fair,' deviation from those ratios might not be 'unfair.' We will not force the Commission to blind itself to reality.
 
 
 44
 In part, NYSA's attacks on the Commission formulation of the newsprint assessment are similar to those asserted against the Puerto Rican formula. Our response to those arguments need not be restated. Nor do we find merit in the NYSA contention that the Commission mechanically applied the Puerto Rican assessment to newsprint; the Commission's decision itself belies that assertion.
 
 
 45
 Finally, NYSA quarrels with the Commission's comparison of the percentage increases in the assessment of various cargoes, maintaining that under Volkswagen such comparisons are only applicable in cases in which the Commission is reviewing a formula that is applied unequally to different parties or cargoes. The conclusion sought to be drawn from this argument here is that, since newsprint is assessed in the same manner as other cargoes under T-2390, the Commission should not have inquired into the relative impact of the increase. This contention reads the Commission's mandate too narrowly. The uniformity of an assessment does not necessarily make it fair and reasonable. That is particularly true where, as here, the Commission found that the benefits received by the parties differed. NYSA's further assertion that the formula was correcting past underassessment of newsprint only reiterates an element that the Commission recognized and took into account in reaching its conclusion.
 
 
 46
 3. The Automobile Interests.
 
 
 47
 Petitioners representing the automobile interests support the assessment formula for their cargo. The sole challenger on this point is NYSA. It contends that its assessment formula of 20% Of measurement, approved by the Commission in its first decision and by the Hearing Examiner in the reopened proceedings, was fair, and that the Commission's subsequent decision was an arbitrary compromise accepted after a proceeding that uncovered no new evidence relevant to the automobile assessment.
 
 
 48
 But the Commission did consider new evidence that was relevant to a determination of the fairness of the automobile assessment. The Commission's initial determination that the 20% Of cubic measurement was a fair assessment was derived from calculations based on a tonnage charge of $1.23 per ton, a figure then considered sufficient to finance the estimated cost of the ILA agreement. However, by the time the Commission considered the matter anew in the reopened proceedings, the tonnage charge had risen to $3.23 in order to reflect the fact that experience had proven the ILA agreement to be considerably more costly than initially contemplated.
 
 
 49
 Thus, the overall picture had changed significantly since the Commission's determination that the 20% Of measurement assessment was a fair one. The burden on automobiles had increased considerably. Moreover, the magnitude of the increase in the burden occasioned by the escalation of fringe benefit costs was not uniform among the various assessment categories. Just as any tonnage basis of assessment costs the efficient carriers comparatively more in relation to the breakbulk operators than did the man-hours assessment, any increase in the cost per ton falls more heavily on their shoulders as well. In light of the Commission's determination that automobiles 'were not the major cause of the ILA concern nor the chief beneficiary of the collective bargaining agreement,' JA II, at 547, we cannot agree that no new evidence existed that would justify the Commission's reconsideration of the fairness of the automobile assessment.
 
 
 50
 Many of NYSA's assertions relating to the question of the propriety of the automobile assessment mirror those previously considered in relation to newsprint and the Puerto Rican trade, and will not be discussed anew here. The remainder of the Association's contentions relate primarily to the manner in which the Commission chose to evaluate the evidence.
 
 
 51
 NYSA has identified for this court relevant portions of the Examiner's findings which, if interpreted in the manner suggested by NYSA, would lead to the conclusion that the 20% Assessment of T-2390 is the only fair assessment. However, as we have noted earlier in this opinion and countless times in previous opinions, it is not the role of this court to decide these matters denovo. Rather, our inquiry is limited to a determination whether there is substantial evidence on the record to support the Commission result. Examination of this record reveals that the Commission evaluated the numerous suggested assessments for automobile cargoes and weighed the nature of the burdens imposed by each against the nature of the benefits received by the automobile interests. Moreover, as the Commission opinion makes clear, the Commission fully understood the obligation imposed on it by the Volkswagen case and operated within those parameters. It is not fatal to the final decision that the Commission differed with its own previous determination where, as here, it carefully articulated a proper basis for its ultimate conclusion that finds support in substantial evidence. Although inconsistencies may and should prompt more careful judicial scrutiny, where that examination reveals no impropriety, the fact of alteration itself is of no dispositive significance.
 
 IV
 
 52
 In light of the substantial number of contentions raised before this court that appear to repeat issues raised and considered in administrative proceedings, it is perhaps appropriate to close with a reiteration of the judicial role in proceedings of this nature. The Commission's powers under Sections 15, 16, and 17 of the Shipping Act are unquestionably broad. Once the court has satisfied itself that the Commission properly understood the nature and scope of its duties, its reveiwing function on questions of fact is limited to determining whether substantial evidence exists to support the Commission's determinations. We have examined carefully the procedural challenges raised, as well as the questions that appear to present issues of the Commission's statutory authority. Having satisfied ourselves that the Commission did not err in these matters, we have examined the Commission's factual determinations, and its conclusions therefrom, under the substantial evidence standard of review. In no occasion did we find reversibel error. Accordingly, we affirm the Commission's approval of T-- 2390, as modified, in all respects, and deny the petitions for review.
 
 
 53
 It is so ordered.
 
 
 
 [1]
 This general background description has been summarized from the Hearing Examiner's and the Commission's reports, which are contained in the joint appendices (JA) filed as a part of this appeal
 
 
 [2]
 NYSA has apparently since adopted a different approach in allocating the cost of the subsequent labor contract. First, the membership of NYSA changed. The carrier members withdrew, leaving only stevedores and direct employers of labor. NYSA then adopted an assessment formula that follows some of the general patterns of T-2390, bolstered by an enforcement clause that effectively deprives non-paying shippers of any longshoremen labor. In July of 1972, NYSA and ILA petitioned the Commission for a declaratory judgment that that assessment agreement was not covered by Section 15 of the Shipping Act. Upon the Commission's rejection of their position, both sought review in the Second Circuit (Nos. 73-1919, 73-1991, 2d Cir.) In July of 1973 Transamerican Trailer Transport, Inc., also a party to this appeal, presented a petition for review of the matter in this circuit. We subsequently granted NYSA's motion to transfer TTT's petition to the Second Circuit (No. 73-1782, Aug. 22, 1973)
 
 
 [3]
 NYSA previously filed two prior allocation agreements with the Commission. The first, a 'temporary' agreement adopted by NYSA members on September 29, 1969, called for contributions to be based largely on a manhour basis, but assessed most cargoes for the 'shortfall' of contributions attributable to strikes or economic recessions on a tonnage basis. The temporary agreement was superseded by a 'permanent' agreement, adopted in December of 1969 by a vote of 35-17, which provided a tonnage basis as the sole method of assessment of most cargoes. That agreement was in turn superseded by T-2390. During the negotiations and considerations of these agreements, the old man-hours basis of assessment continued in effect. Thus, the new system was not actually implemented until the spring of 1970
 
 
 [4]
 The unique nature of the employment relationship in the maritime industry creates the need to provide a mechanism for the funding and disbursement of fringe benefits. In essence, the longshoreman is an employee of the entire port industry. His individual loading assignments often cause him to work for a number of employers in a relatively short span of time. Thus, the practice in the Port of New York and other ports is for the individual employer to pay the longshoreman's wages for the time that he works on that particular job, and for a common association, in this case NYSA, to pay the fringe benefits that accrue generally from employment in the industry rather than from employment in a particular assignment
 
 
 [5]
 'Excepted cargo' under the agreement included all cargo moving in domestic commerce or the intercoastal trade of the United States, excluding cargo moving to points outside the continental United States. The characterization of this cargo as 'domestic' was somewhat misleading. As the discussion of the Hearing Examiner reveals, the basis for the creation of the excepted status was NYSA's concern that certain 'marginal' cargoes would be diverted to other locations if burdened with too great an assessment
 'Excepted cargo' did not escape all payment. In place of the regular man-hour tonnage assessments imposed by T-2390, the 'excepted cargo' was to be assessed on the basis of the previously existing rates for certain expenses and was exonerated entirely of liability for 'shortfall' until October of 1970, at which time it would pay for that expense on the basis of the assessment rate then applicable for other cargoes.
 
 
 [6]
 The peculiar nature of automobile cargo necessitated a special assessment formula for it. The combination of the fact that automobiles are a highly productive cargo and their peculiar shape makes either of the traditional methods of measuring that cargo, weight or cubic measurement, inappropriate. This was recognized by all parties before the court, and the basic decision to formulate some different standard for assessing automobiles is not at issue here. The dispute centers on the more narrow question of which of a number of proposed special formulae is the proper one
 
 
 [7]
 The Hearing Counsel participated throughout the extensive proceedings. In response to the Commission's request that the parties offer mutually acceptable assessment formulae, the Hearing Counsel offered a method for charging the Puerto Rican cargo in his opening brief in the reopened proceedings. The Hearing Examiner termed it a 'complicated proposal apparently based on much consideration . . . but apparently unacceptable to any of the parties.' Near the close of the Examiner's proceedings, the Hearing Counsel submitted a new method of assessing the expenses for automobiles. The other parties neither requested nor were granted the opportunity to comment on the Hearing Counsel's proposals at that stage, and the Hearing Examiner did not comment in detail on them other than to note that the NYSA's solution had more substantial merit
 The Commission considered arguments presented in opposition to the Hearing Counsel's proposals in the second proceedings before it, and concluded that his approach was preferable to any other advanced.
 
 
 [8]
 Id., at 282, 88 S.Ct. at 941 (Stewart, J.). In Volkswagen the Commission had concluded that there was no Section 17 violation because the petitioner had received 'substantial benefits' and there was no demonstration of intent to impose an unfair burden on the part of the association that levied the charge. Id., at 281, 88 S.Ct. at 940. This interpretation, in the opinion of the Volkswagen majority, 'reflects far too narrow a view of 17.' 'The question under 17 is not whether the petitioner has received some substantial benefit as a result of the . . . assessment, but whether the correlation of that benefit to the charges imposed is reasonable. The 'substantial benefits' measure of unreasonableness used by the Commission in this case is far too blunt an instrument.' Id., at 282, 88 S.Ct. at 940. In his concurrence, Justice Harlan further emphasized the breadth of the Commission's function. 'The existence of such a categorical difference between the benefits received by different groups should at least invite inquiry whether the charges are as appropriately proportioned as would be feasible.' Id., at 294, 88 S.Ct. at 947 (Harlan, J., concurring)
 
 
 [9]
 We do not interpret the Supreme Court's decision in Volkswagen to have altered the Consolo standard of review in cases in which the Commission demonstrates that it properly understands the nature and scope of its statutory duty, and the questions for judicial review involve principally challenges to the conclusions derived by the Commission from the evidence presented to it. In a companion case to Volkswagen, the Court clarified this point while reviewing a court of appeals' reversal of a Commission decision of a disputed factual question:
 The issue to be decided here was a purely factual one, and the Commission was entitled to draw inferences . . . from the record as a whole. Although any conclusion as to the . . . rate . . . must to some extent rest on 'conjecture,' the court below misconceived its reviewing function when it found this a sufficient basis for setting the Commission's finding aside. Having correctly noted that positive proof on various aspects of the case was simply not available one way or the other, the Commission was fully entitled to draw inferences on these points from the incomplete evidence that was available. 'Conjecture' of this kind, when based on inferences that are reasonable in light of human experience generally or the Commission's special familiarity with the shipping industry, is fully within the competence of this administrative agency and should be respected by the reviewing courts.
 Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linen, 390 U.S. 238, 248-249, 88 S.Ct. 1005, 1011, 19 L.Ed.2d 1071 (1968).
 
 
 [10]
 Many of the petitioners complain that the Commission basically agreed with the Hearing Examiner in his findings of fact and yet disagreed with his conclusions. They insist that the Commission could not have possibly come to any other conclusions than those reached by the Hearing Examiner if it agreed with the Examiner's characterization of the facts. This contention turns a blind eye to the Commission's elaboration of the nature of its reasons for disagreeing with the Examiner's conclusions, JA II at 524, n. 4, and its articulation of reasoning to buttress the conclusions that it chose to draw from the facts. As this court observed in considering a similar problem in the context of review of an FCC decision, 'in the last analysis it is the agency's function, not the Examiner's, to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs.' Greater Boston Television Corporation v. FCC, 143 U.S.App.D.C. 383, 395, 444 F.2d 841, 853 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2231, 29 L.Ed.2d 701 (1971); see also Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Cinderella Career & Finishing Schools, Inc. v. F.T.C., 138 U.S.App.D.C. 152, 425 F.2d 583, 588 (1970). Nor do we find any problem with the fact that the Commission altered its earlier determination. Its final decision finds support in the record, and its reasons for altering its previous conclusions are well articulated and related to the evidence presented in the initial proceedings and in the reopened proceedings. Greater Boston Television Corp., supra, 143 U.S.App.D.C. 383, 444 F.2d at 852; FTC v. Crowther, 139 U.S.App.D.C. 137, 430 F.2d 510, 513-515 (1970); Cf. FCC v. WOKO, Inc., 329 U.S. 223, 227-228, 67 S.Ct. 213, 91 L.Ed. 204 (1946)
 
 
 [11]
 Petitioner Seatrain raises additional claims that involve essentially questions of contract interpretation. We find ourselves in agreement with the Commission that the Hearing Examiner properly disposed of these contentions. See JA I at 246, n. 13, and at 216-18
 
 
 [12]
 'Shortfall' is an item of the labor expense attributable to the failure of the Port of New York to attain a total of 40 million hours of labor annually. The Commission found that it would be unfair to assess the cargoes whose man-hours of labor employed were growing with a shortfall expense, the basis of which is a decrease in hours of labor employed. See JA I, at 240-41; JA II, at 530-32. Guaranteed annual income, by contrast, is an obligation on the part of NYSA to guarantee each longshoreman 2,080 hours per year of work, vacations, etc. Unlike some of the fixed obligations in the labor agreement, GAI varies depending on the number of eligible recipients. NYSA apparently vastly underestimated the number of men who would receive GAI and thus the cost of that element of the ILA agreement. See JA I, at 176; JA II, at 500-02, 532-34
 The Hearing Examiner and the Commission disagreed on the significance of these individual expenses in the determination of the overall fairness of the assessment formulae. Compare JA II, at 496 with JA II, at 530-38.
 
 
 [13]
 City of Lafayette v. SEC, 147 U.S.App.D.C. 98, 105, 454 F.2d 941, 948 (1971), aff'd sub nom., Gulf States Utilities v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973). See also Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied sub nom., Consolidated Edison of New York v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956)