571 F.2d 1231
 187 U.S.App.D.C. 282
 NEW YORK SHIPPING ASSOCIATION, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
States Marine International, Inc., et al., Intervenors.
STATES MARINE INTERNATIONAL, INC., et al., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
New York Shipping Association, Inc., Intervenor.
 Nos. 76-2024 and 76-2026.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 1, 1977.
Decided Jan. 13, 1978.
As Amended Feb. 3, 1978.
 
 Donato Caruso, New York City, with whom C. P. Lambos, New York City, was on the brief, for petitioner in No. 76-2024 and intervenor in No. 76-2026.
 Stanley O. Sher, Washington, D. C., with whom Peter B. Kenney, Washington, D. C., was on the brief, for petitioner in No. 76-2026 and intervenor in No. 76-2024.
 Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Carl D. Lawson and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.
 Jacob P. Billig, Washington, D. C., also entered an appearance for intervenor, States Marine International, Inc.
 Before WRIGHT, McGOWAN and WILKEY, Circuit Judges.
 Opinion for the Court filed by McGOWAN, Circuit Judge.
 McGOWAN, Circuit Judge:
 
 
 1
 To alleviate the impact on dock workers of mechanization in the loading and unloading of ocean carriers, associations of waterfront employers have agreed, through collective bargaining with labor unions, to establish new and larger fringe benefit funds for longshoremen. In 1968, the Supreme Court, through its decision in Volkswagenwerk Atkiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090, imposed an overlay of governmental regulation upon this bargaining structure by construing section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (Supp. V 1975), as requiring multi-employer associations to seek prior approval of agreements allocating the burdens of the collectively bargained fringe benefit obligations.
 
 
 2
 These consolidated petitions reflect the continuing efforts of the multi-employer association in the Port of New York to gain Commission approval of a plan allocating the obligations established in a three-year collective bargaining agreement signed, after a lengthy strike, in the very year Volkswagenwerk was decided. No. 76-2024 involves the question of whether the Commission properly ordered the petitioner association to reimburse certain member employers for overassessments paid by them under that plan, which the Commission, in order to avert another strike, conditionally approved in 1970, and finally approved in 1972 subject to major revisions. No. 76-2026 raises the derivative question of whether the Commission properly refused to force the association to pay interest on the refunds awarded to the overassessed member employers. We find that the Commission acted within its authority in both instances; and we accordingly affirm its order requiring the refunds but denying interest thereon.I
 
 
 3
 An understanding of the issues raised in these petitions requires some feel for the painful transition in maritime transportation from labor-intensive cargo handling to the modern and largely mechanized system of containerized cargo, and for the employees' efforts at the bargaining table to preserve their financial security in the face of these sweeping changes. Large portions of this history have been set forth in New York Shipping Association v. FMC, 495 F.2d 1215 (2d Cir.), cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974), and Transamerican Trailer Transport, Inc. v. FMC, 160 U.S.App.D.C. 351, 492 F.2d 617 (1974); and our description will be confined to the facts immediately involved in this case.
 
 
 4
 A decade of industrial strife occasioned by waterfront mechanization, described in general labor relations terms in Volkswagenwerk, supra at 295-306, 88 S.Ct. 929 (Douglas, J., dissenting), came to a head in the Port of New York in 1968 with a 57-day strike. The result of that strike was a collective bargaining agreement between the New York Shipping Association (the Association), which represents all of the employers here involved,[1] and the International Longshoremen's Association (ILA). That agreement, among other things, assured longshoremen of considerably enhanced fringe and guaranteed-annual-income benefits. Traditionally the employers had paid for their share of such benefits by contributing a certain amount of money for each hour of longshore labor used. With the coming of automation in large segments of the industry, however, and with the escalation of benefits, this man-hour system imposed an inordinate burden upon the minority of remaining "break-bulk carriers" that continued to handle cargo unsuitable for any but labor-intensive, unmechanized handling. Consequently, these carriers, including intervenors in No. 76-2024 and petitioners in No. 76-2026, a group of twelve break-bulk shipping companies, referred to as the States Marine Group (SMG),[2] argued that contributions to the benefits fund under the 1969-1971 collective bargaining agreement should be based on tonnage handled, rather than man hours utilized, by each employer.
 
 
 5
 Disagreement over the method of funding the benefits called for in the collective bargaining agreement in 1968 had, by early 1970, raised the spectre that funds would not be forthcoming, which in turn led the ILA to threaten a second strike. In order to avert that possibility, the Association, in February 1970, asked the Commission, in advance of the usual round of hearings and proposed and final decisions, to approve immediately but conditionally a compromise allocation agreement calling for man-hour assessments of some employers and tonnage assessments of others. The Commission accepted this approach and conditionally approved the assessment plan,[3] upon assurances by the Association that it would later adjust the assessment burdens should the Commission, following more extended consideration, modify the allocation plan pursuant to section 15 of the Shipping Act of 1916.[4]
 
 
 6
 Armed with these assurances, the bulk of the employers for the moment put aside their claims that the allocation plan was inequitable and contrary to section 15, went along with the temporary solution, and thereby averted a strike.[5]
 
 
 7
 Not until 1972 did the Commission reach a final decision on the compatibility of the 1968-1971 allocation plan with section 15.[6] It then held that a group of ocean carriers serving Puerto Rico the Puerto Rican Group (PRG) which had been assessed on a tonnage basis but had paid on a man-hour basis, should have been assessed partially on each basis.[7] The upshot was that, while technically overassessed, PRG actually underpaid. To the extent that PRG had underpaid, all other members of the Association, including the States Marine Group, had overpaid and accordingly were due compensation, according to the Commission.[8] Challenged in this court, the Commission's final order was upheld in Transamerican Trailer Transport, Inc. v. FMC, supra; and the parties returned to the Commission to devise a means of making the necessary adjustments.
 
 
 8
 It is with this later implementation phase of the Commission's modification of the 1969-1971 allocation plan that we are concerned. This phase overlapped with the efforts of Association members to adjust their rights and liabilities under two subsequent and successive collective bargaining agreements fixing the level of benefits that they would have to fund for the 1971-1974 and 1974-1977 periods respectively. Consequently, the efforts to adjust the rights and liabilities in all three periods became intertwined, necessitating some discussion by us of events related to the second two assessment periods.
 
 
 9
 Pertinent to the present case is the fact that the Association extended through the second labor contract period, 1971-1974, the same allotment plan that the Commission had conditionally approved in 1970 without the modifications it ordered in 1972. This extension led the Puerto Rican Group, following the Commission's final decision on the 1969-1971 allocation plan, to claim that it had overpaid in the second period to the same degree that the Commission had found it to have been overassessed in the first period.[9] In 1974, the following potential claims, as relevant here, lay before the Association:
 
 
 10
 (1) Pursuant to the Commission's 1972 Order, all members other than PRG sought refunds of approximately $5 million to reimburse them for the amount that they overpaid during the 1969-1971 period because PRG had underpaid.[10]
 
 
 11
 (2) Pursuant to extrapolations from the Commission's 1972 Order,[11] PRG sought refunds of approximately.$7.4 million for overassessments in the 1971-1974 period, which had resulted in underassessment of all other members.[12]
 
 
 12
 Like 1968, 1974 was a watershed year for labor-management relations in the New York Port. In that year a new collective bargaining agreement went into effect for the 1974-1977 period with respect to which the Association adopted an assessment formula based entirely on tonnage. Moreover, the Association, in response to pressure from the ILA, entered into a series of settlements in 1974 that largely, but, as this case attests, not entirely, resolved the claims pending before it and arising out of the first three assessment periods. Most important here, the Association and the Puerto Rican Group agreed to offset the refunds due all other Association members from PRG for the first period against those claimed by PRG from the other members in the second period.[13] Unlike the other settlements, however, see note 13 supra, this one did not pass through the Commission unscathed. Following opposition by SMG, the Commission approved the settlement subject to the following caveat:
 
 
 13
 IT IS FURTHER ORDERED that such agreement and our approval herein shall in no way affect or diminish the rights of States Marine International, Inc., et al. (i. e., SMG) to refunds under Docket No. 69-57 (i. e., under the 1968-1971 allocation plan as modified by the Commission's 1972 Order).[14]
 
 
 14
 The Board of Directors of the Association accepted this caveat without withdrawing the agreement as conditioned, so that the settlement went into effect. In fact, months before the Commission acted, the Board of Directors evinced an awareness of the "possibility that certain interests such as the break-bulk carriers (i. e., SMG) may seek to recover amounts which they may claim are owing by the Puerto Rican carriers for the 1969-1971 period." Nonetheless, following the recommendation of the Association's counsel, the Association approved the settlement and submitted it to the Commission, which in turn made the SMG caveat explicit.[15]
 
 
 15
 By early 1975, in summary, the situation on the New York waterfront left the break-bulk carriers in the States Marine Group with the full tonnage assessment formula for the future that they desired, and it left the Association free, with one exception, from all of the Volkswagenwerk litigation that had plagued it since 1968.[16] Even so, the legacy of the strike and collective bargaining agreement of 1968, as well as of the Supreme Court's Volkswagenwerk decision of that year, have continued to haunt the Association and the Commission until this day, almost a decade later. Because the settlements left pending the SMG claims from the first assessment period, the Commission in 1975 and 1976 proceeded with the implementation phase of its consideration of the 1969-1971 assessment plan. In this phase, SMG argued that either or both the Association and PRG must reimburse it for the amount it overpaid in 1969-1971, plus interest calculated at two percent per month (not compounded) payable from September 30, 1971, in order to make up for PRG's underpayments in that first period. Over the vigorous opposition of the Association, and PRG, see note 7 supra, and contrary to the finding of the trial examiner, the Commission in September 1976, by a 3-2 vote, awarded SMG the refunds it sought from the Association, which it preliminarily calculated at $689,599, but it denied interest on these refunds.[17] Both the Association and SMG petitioned this court for review of the parts of the Commission order adverse to themselves.
 
 II
 
 16
 Given the detail required even to sketch the complex labor relations scene in the New York Port over the past decade, the task advocated by petitioners of rearranging that scene by reference to the broad and amorphous language of section 15 of the Shipping Act, see note 4 supra, should and must be approached with caution. In a setting already cluttered with prolonged multiparty negotiations between labor and employers as well as among the employers themselves, and in one dotted with strikes and threatened strikes, the Commission properly limits its function under Volkswagenwerk and section 15 to that essentially of a neutral arbiter seeking to assure that the parties acting independently have achieved a broadly equitable arrangement of benefits and burdens. See Volkswagenwerk, supra at 282, 88 S.Ct. 929, authorities cited in note 16 supra.
 
 
 17
 Beyond assuring the neutrality and procedural circumspection of the Commission in that endeavor, which are not in question here, the role of this court is even more circumscribed, aiming only to assure that the parties' and the Commission's broad equalization of benefits and burdens has substantial evidentiary support for its necessary factual predicates and is reasonable. See generally Consolo v. FMC, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).
 
 III
 
 18
 The Association has advanced two major arguments in favor of relieving its members collectively of any obligation to the States Marine Group arising out of the 1969-1971 assessment period. To the Commission, the Association argued primarily that the settlement with PRG freed SMG of a liability to PRG in respect to the second assessment period that equaled or exceeded PRG's liability to SMG from the first assessment period. In this court, the Association has placed somewhat greater emphasis upon the argument that whatever SMG claims have survived the settlement run against PRG directly rather than through or against the Association.[18]A.
 
 
 19
 In addressing the first argument, that SMG's first-period claims were satisfied by PRG's abandonment of its second-period claims, we face primarily a factual question as to which the Commission's answer has substantial support in the record before us. In essence, a majority of the Commission found that SMG's fully adjudicated right to payments of approximately $600,000 arising out of PRG's underpayments in the 1969-1971 period were not satisfied when PRG gave up its highly contingent rights to a like, or perhaps slightly larger, amount arising out of SMG's alleged underassessments during the 1971-1974 period. Although our review must be concerned primarily with the Commission's and not the Administrative Law Judge's finding, Transamerican Trailer Transport, Inc. v. FMC, supra 160 U.S.App.D.C. at 360, n. 10, 492 F.2d at 626 n. 10, we note that in this instance the two findings were not in accord. Nonetheless, consideration of the ALJ's reasons for finding against SMG on this point, which the Association has reiterated to us, reveals no reason to overturn the Commission's contrary finding.[19]
 
 
 20
 Initially, the ALJ contended that by approving the overall settlement between PRG and the Association, the Commission already had decided, pursuant to section 15 and Volkswagenwerk, that trading off the 1969-1971 rights of Association members (including those of SMG) against the 1971-1974 rights of PRG achieved a reasonable equalization of benefits and burdens for all concerned during the two periods. A predicate for such a decision, of course, would be that PRG's second-period rights approached the degree of solidity that the Commission's 1972 Order had given the other Association members' first-period rights, so that subtracting one from the other would leave a zero sum. The Commission tells us, however, that its approval of the settlement was not based on Volkswagenwerk's "reasonable equalization of benefits and burdens" standard, but instead upon a requirement that each party receive "valuable compensation" from the compromise agreement.[20] Hence, because the Commission recognizes even the savings of litigation costs as valuable compensation, its approval of the settlement does little to dispel the cloud of uncertainty over PRG's second-period claims.
 
 
 21
 Nor are we impressed with the ALJ's independent conclusion, based on his review of the facts, that the settlement and other events surrounding the 1971-1974 and 1974-1977 periods afforded SMG benefits that equitably offset its overpayments in the 1969-1971 period. This conclusion stems primarily from the ALJ's static view of how the industry's fringe benefits obligations should have been allocated among the Association's members during the entire 1969-1977 time frame. Under this view, the ALJ assumed that the Commission would have made the same adjustments in the second period assessment agreement as it made in the identical first period agreement. Consequently, he reasoned, PRG was overassessed and SMG was underassessed. This static view further led the ALJ to assume that the solely-tonnage-based formula developed in the third period awarded SMG a special benefit vis-a-vis the rest of the Association that should be applied against the amount due it in the first period.
 
 
 22
 A majority of the Commission takes a far more evolutionary view in assessing the propriety of assessment formulas during the three periods from 1969 to 1977. It correctly notes that its first-period concessions to the Puerto Rican interests were based on the need to protect the ocean-cargo-dependent economy of Puerto Rico from too abrupt a change-over from man-hour to tonnage assessments. See Transamerican Trailer Transport, Inc. v. FMC, supra 160 U.S.App.D.C. at 362, 492 F.2d at 628. By 1971, of course, the abruptness and surprise of a switch-over to tonnage assessment could no longer be cited in PRG's favor. More broadly, the Commission endorses the industry-wide trend in the New York Port toward assessments based on tonnage alone a trend culminating in the 1974-1977 agreement.
 
 
 23
 The Commission reasonably views this trend as an equitable industrial-relations response to rising labor-benefits costs that are themselves brought on by a more pervasive trend toward mechanization on the waterfront. Under this view, the Association's adoption of the same formula in 1971-1974 as it used in 1969-1971, because it resists the trend toward an all-tonnage-based formula, was more likely to have overburdened the break-bulk carriers in the States Marine Group than it was to have harmed the mechanized carriers in the Puerto Rican Group. And, by like reasoning, the all-tonnage formula used in the third period, rather than specially benefiting SMG, might well have given it no more than its equitable due. As such, we accept the Commission's conclusion that all three of the ALJ's critical assumptions that PRG was overassessed in the second period, and that SMG was underassessed in both the second and the third periods cannot bear scrutiny.
 
 
 24
 In sum, we agree with the Commission that because it has no evidence before it that definitely establishes special benefits to the States Marine Group from the second and third periods, it cannot justify withholding from those carriers the fully adjudicated adjustments owed it from the first period.[21]B.
 
 
 25
 We examine the Association's second argument that PRG rather than it should bear responsibility for satisfying SMG's claims against the background of its promise in 1970 to be responsible for making all adjustments necessary to bring the assessment plan conditionally approved by the Commission into conformity with whatever plan the Commission finally approved. Not only did these explicit assurances pave the way for the Commission's and its membership's acceptance of a modus vivendi sufficient to avert a second strike in two years. They also reflected a long-standing modus operandi in the Port under which employers deal collectively, rather than individually, in arranging their rights and liabilities in labor-related matters. From this perspective the Association's attempt to absent itself from this dispute in admittedly unprecedented fashion seems untenable to us, as it did to the full Commission and the ALJ.[22]
 
 
 26
 More credence, perhaps, is due the Association's somewhat more sophisticated variation of this argument, that is to say, because SMG's claims arise solely out of underpayments by PRG, to force all of the members of the Association to satisfy those claims cannot help but burden many of them more than they are benefited by the assessment plan and the labor peace it assures. Hence, so the argument proceeds, the Commission's decision does not adhere to the standard that Volkswagenwerk read into section 15.
 
 
 27
 Even as restated in this manner, we are not inclined to accept the Association's argument. As the representative of its member employers, the Association may take action that, if not appropriately resisted, may act as a waiver by them of their section 15 rights.[23] Accordingly, any member that, unlike SMG, failed to disassociate itself from the settlement agreement with PRG, or from the preservation in that agreement of SMG's rights, cannot be heard to complain about increased assessments in the future that may result from the agreement. Moreover, all members, by joining the Association, accept their share of its current liabilities, so that no new member has cause to object to paying part of the amount owed SMG, even if it was not a member at the time the Association accepted responsibility for meeting those claims.[24]
 
 IV
 
 28
 As discussed earlier, the States Marine Group's rights growing out of the 1969-1971 period are predicated upon the Association's promise in 1970, in return for the Commission's conditional approval of its assessment formula, to make whatever "retroactive" adjustments were later required by the Commission's modifications of that formula. See note 4 supra and accompanying text. From this promise, SMG would have us derive a right on its behalf to interest on the Commission's award of payments and credits that we are leaving undisturbed. This argument is, however, inconsistent with the general rule that interest should not accrue until the amount of a liability is determined. Miller v. Robertson, 266 U.S. 243, 258-59, 45 S.Ct. 73, 69 L.Ed. 265 (1924); Belcher v. Birmingham Trust Nat'l Bank, 488 F.2d 474, 477-78 (5th Cir. 1973); Hansen & Rowland v. C. F. Lytle Co., 167 F.2d 170 (9th Cir. 1948).
 
 
 29
 That general rule seems especially appropriate in the present situation. Here the Commission is acting essentially as a neutral intermediary attempting to assure and effectuate reasonably equitable arrangements of rights devised by the employers themselves. Moreover, the employers' general assumption in 1970 seems to have been that interest would run from the time the rights were finally determined.[25] Consequently, we affirm the Commission's denial of interest before October 21, 1977.[26]
 
 
 30
 For all of the above reasons, we are in agreement with the Commission that the Association undertook the responsibility for satisfying the States Marine Group's claims arising out of the 1969-1971 assessment period and that those claims were not satisfied by the Association's settlement with the Puerto Rican Group, but that the Association need not pay interest on those claims. Accordingly, the Commission's 1976 Order is affirmed and the petitions in Nos. 76-2024 and 76-2026 are denied.
 
 
 31
 It is so ordered.
 
 
 
 [1]
 The members of the Association include stevedoring contractors and other direct employers of labor (voting members), and carriers using the port (nonvoting members)
 
 
 [2]
 The States Marine Group is made up of the following break-bulk carriers: States Marine International, Inc.; Isthmian Lines; Prudential Lines, Inc.; Atlanttrafik; Barber Lines; Blue Sea Line; Concordia Line; Hellenic Lines; Hoegh Lines; Meyer Line; Nedlloyd Line; and Norwegian America Line. Three of these carriers, States Marine International, Inc., Isthmian Lines, and Meyer Line no longer call at the Port of New York
 
 
 [3]
 Conditional Approval of Agreement 2390 (March 11, 1970) (unpublished) (hereinafter referred to as Conditional Approval Order ), reprinted in Joint Appendix (JA) at 52a-60a
 
 
 [4]
 In relevant part, section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (Supp. V 1975) provides:
 Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulation, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.
 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. . . .
 The Association's assurances that it would make all necessary adjustments were reflected in the Conditional Approval Order, supra note 3, J.A. at 60a:
 It is ORDERED, that Agreement T-2390 is hereby approved subject to any and all adjustments and conditions as shall be ordered by the Commission in its final disposition of this proceeding.
 The Association most forcefully affirmed this assurance in statements opposing a petition to the Commission to stay and reconsider the conditional approval. In its reply to the petition, the Association assented to any "modification as determined by the Commission" and agreed to make "all adjustments . . . retroactive()." J.A. at 62a. Further, in testimony before a hearing examiner on March 16 and April 10, 1970 considering the petition, its representative promised that the Association would evolve "administrative procedures (to) take care of" "any adjustments made by the Federal Maritime Commission" so that "whatever formula is approved (w)ould be retroactive to October 1, 1969." J.A. at 475a, 476a.
 
 
 [5]
 A few Association members unsuccessfully requested that conditional approval be stayed, see note 4 supra, but the States Marine Group joined the majority of Association members supporting conditional approval. It did so, however, only after arguing to the Commission that the 12 break-bulk carriers had "clearly overpaid," possibly as a result of underpayments on "Puerto Rican cargo," and accordingly that they were "vitally concerned that adjustments be made." J.A. at 71-73a
 
 
 [6]
 Cooperative Working Arrangement, 15 F.M.C. 259 (1972) (hereinafter referred to as the 1972 Order )
 
 
 [7]
 The Puerto Rican Carriers are Sea-Land Service Inc.; Seatrain Lines, Inc.; and Transamerican Trailer Transport, Inc. These carriers participated in all of the proceedings concerning the 1968-1971 assessment formula up until the Commission issued the order in 1976 that is the subject of the petitions in this case. They have not participated in our consideration of these petitions, however
 
 
 [8]
 15 F.M.C. at 275. Adjustments were also made in favor of newsprint and automobile shippers because they, too, were found to have been overassessed in the 1969-1971 period
 
 
 [9]
 In the second period PRG had contributed to the fund according to the Association's formula, so that in this period, unlike the first period, see text accompanying notes 7-8 supra, PRG had overpaid as well as been overassessed
 
 
 [10]
 Most prominent among the parties claiming refunds under this heading was the States Marine Group of break-bulk carriers. Notably, that group had insisted throughout the early 1970's that, so long as the Association failed to assess all members on a tonnage basis, the break-bulk carriers would suffer financially relative to all other carriers
 
 
 [11]
 These extrapolations flowed from the assumption that, because the assessment formulae submitted to the Commission by the Association in the 1969-1971 and the 1971-1974 periods were identical, the Commission would find the same facts, and thus make the same equitable adjustments, in the second period as it had in the first
 
 
 [12]
 The newsprint and automobile carriers, also advanced claims based on findings in the 1972 Order, supra note 6, as to overassessments of them for the 1969-1971 period and based on extrapolations therefrom to the 1971-1974 period. See note 8 supra
 
 
 [13]
 In addition, Association settlements with the newspaper and automobile carriers gave those interests concessions in the third and future assessment periods in return for their giving up all refund claims arising out of the first and second periods. See note 12 supra. These settlements were unconditionally approved by the Commission. Approval of Agreement Nos. T-3007-2 and T-3055 (Feb. 21, 1975) (unpublished), reprinted in J.A. at 747a-52a; Approval of Agreements No. T-3007-1 and T-3023 (Dec. 13, 1974) (unpublished), reprinted in J.A. at 716a-22a
 
 
 [14]
 Approval with Condition of Agreement No. T-3017 (Jan. 16, 1975) (unpublished), reprinted in J.A. at 731a-38a. Even before the Commission added the quoted caveat, the agreement between the Association and PRG purported to be made "without regard to the continuance of said litigation by other parties." J.A. at 737a
 
 
 [15]
 Letter from C. P. Lambos, counsel, to the President and Directors of the New York Shipping Association, August 27, 1974, in J.A. at 821a-22a. The Association's treatment of the SMG claims as a liability of the settlement, although one ultimately not deemed fatal, suggests an awareness that it might later face responsibility for satisfying those claims despite the settlement. The Puerto Rican Group's understanding of the impact of SMG's claims on the settlement does not appear in the record
 The Lambos letter quoted in text refers to "certain interests, such as the break-bulk carriers." Id. (emphasis added). The record before us provides little indication of what interests beyond SMG have pursued first period claims arising from the PRG underpayments despite the settlement with PRG. Nevertheless, in its order being reviewed in this case and in subsequent orders carrying out that decision, the Commission referred to other claims, estimated by the parties to involve between $2 and $3 million, which it is now proceeding to adjudicate, subject to defenses of "waiver or late filing or . . . duplicati(on)." Order Redetermining Amount and Directing Satisfaction of State Marine Group's Claims (August 22, 1977) (unpublished) (hereinafter referred to as Aug. 22, 1977 Order ). See Agreement No. T-2336 New York Shipping Association Cooperative Working Arrangement (hereinafter referred to as 1976 Order), FMC (Sept. 17, 1976), reprinted in J.A. at 422a-60a. Because the Commission's and our resolution of the SMG claims and the Association's defenses thereto rest so heavily on the particular facts involved, that resolution may not directly control these other claims.
 
 
 [16]
 Although the Association after 1975 faced no more challenges to its assessment formulae in the second and third period, as far as the record of this case indicates, the Commission has not yet approved them. Volkswagenwerk apparently requires that the Association file these agreements with the Commission for approval. See New York Shipping Association v. FMC, supra (holding that the Association must file, and the Commission approve, the second-period assessment agreement despite the fact that the ILA in this period, unlike in the first period and unlike the union involved in Volkswagenwerk, was a signatory thereto). But cf. Volkswagenwerk, supra at 287, 88 S.Ct. 929, (Harlan, J., concurring) ("Commission review itself must be circumscribed by the existence of labor problems that it is not equipped to resolve."); Pacific Maritime Association v. FMC, 177 U.S.App.D.C. 248, 543 F.2d 395 (1976), cert. granted, 430 U.S. 905, 97 S.Ct. 1172, 51 L.Ed.2d 580 (1977) (holding, in a quite different context, that an agreement between a union and employers lies outside of the FMC's jurisdiction)
 
 
 [17]
 1976 Order, supra note 15. During the several months before oral argument, the Commission twice has issued supplementary orders. It first recomputed the amount due SMG at $598,947, after subtracting SMG's share of dollar adjustments made by the Association to automobile carriers growing out of first-period overassessments of those carriers. Having thus finally and fully liquidated SMG's claim, the Commission then ordered the Association to devise a means of complying with the 1976 order of adjustments in favor of SMG, and to do so within 60 days, after which interest would begin accruing. Aug. 22, 1977 Order, supra note 15. The second supplemental order approved the Association's compliance plan, which (a) provided cash payments to the three members of SMG that no longer serve the Port, see note 2 supra; (b) extended credits to the other nine members to be applied against future assessments on cargo discharged after Oct. 21, 1977, assuming this court affirms the Commission; and (c) relieved the Association of any interest requirements because of its compliance with the 1976 Order within 60 days of the Aug. 22, 1977 Order. Notice Concerning Satisfaction of States Marine Group's Claim (Nov. 18, 1977) (unpublished). Counsel for the Association noted in oral argument before this court that the entire membership of the Association, including SMG, PRG and even members who did not serve the Port in 1969-1971, will be forced to pay more into the benefits fund to offset any amounts paid out or credited to SMG
 
 
 [18]
 The Association also has advanced a third argument before the Commission and this court, i. e., that SMG has not pursued its claims with sufficient diligence to avoid waiving them. This argument has a hollow ring, in the face of the Association's contrary portrayal of SMG as the only faction of its membership that resisted amicably settling its claims in 1974. In fact, SMG initiated in 1970 its claim of rights to adjustments. See note 5 supra. Moreover, although SMG's lone representative did not break the unanimity of the Association's Board of Directors in favor of the settlement, the group did make known to the Association its intention to pursue its claims in any case, see note 15 supra and accompanying text, and it alone, apparently, reiterated those intentions to the Commission, which approved of them. See Approval with Condition of Agreement No. T-3017, supra note 14, J.A. at 732a-34a
 The Association also has insisted that, pursuant to its bylaws, its members are bound by majority votes of its Board of Directors, and that SMG accordingly is bound by the Board's unanimous decision not to pursue further claims against PRG. Aside from the fact that the bylaw relied upon by the Association in this respect appears not to cover the board's votes on the matters relevant in this case, it appears that the board voted merely to approve the settlement despite the possibility that it would not resolve the SMG claims. See note 15 supra. Finally, the legal rule requiring courts to honor bylaws binding upon litigants recognizes a public-interest exception implicated by the Commission's exemption, on public policy grounds, of SMG from the terms of the settlement. E. g., Haebler v. New York Product Exchange, 149 N.Y. 414, 427, 44 N.E. 87, 91 (1896).
 
 
 [19]
 The ALJ's findings are made in Supplemental Initial Decision, Agreement No. T-2336 The New York Shipping Association Cooperative Working Arrangement (Jan. 20, 1976), in J.A. at 375a-96a
 
 
 [20]
 On its face, the approval order states no standard, except that "(t)he parties' approach to settlement of the rights and obligations between . . . themselves does not appear to be improper and has not been challenged." Approval with Condition of Agreement T-3017, supra note 14, J.A. at 734a. The "valuable compensation" standard is a distillation in the Commission's brief of after-the-fact statements by it in the 1976 Order, in which it described the settlement approval as based on "(c)onsiderations . . . not necessarily coincide(nt) with the process of making, findings or a record in a litigated proceeding," including "good faith" on the parties' part "in attempting to predict rights and liabilities." 1976 Order, supra note 15, J.A. at 433 & n. 8. We are not inclined to dispute the Commission's factual characterization of the standard it used in reviewing this settlement agreement. On the other hand, we do not necessarily endorse that standard's legal validity, as it is not now before us. Compare Volkswagenwerk, supra at 282, 88 S.Ct. 929 (rejecting, in a contested case, a "substantial benefit" standard, in favor of one requiring a reasonable equalization of benefits and burdens), with id. at 278, 88 S.Ct. 929 (suggesting that more "expeditious approval" might be appropriate for "so much of (an assessment) agreement as is not in dispute.")
 Even were we to assume that the Commission predicated its approval on a finding that the settlement equalized benefits and burdens among Association members generally, we could not escape the Commission's explicit conclusion that no such equalization was proven as to SMG. See Approval with Condition of Agreement No. T-3017, supra note 14, J.A. at 734a.
 
 
 [21]
 Our decision, like the Commission's is based on a comparison of what SMG assuredly is due from the first period and what, from the record before us, we can tell that it might owe in the second and third periods. The decision in no way prevents the Commission, in reviewing the second- and third-period assessment formulae on a more complete record from making whatever adjustments are necessary, including ones against SMG and in favor of PRG or other Association members
 
 
 [22]
 1976 Order, supra note 15. On this point, the commission was unanimous
 
 
 [23]
 As noted earlier, the break-bulk carriers in SMG actually will pay their proportionate share of any increased assessments caused by the first-period adjustments awarded them. See note 17 supra. This fact bears out the view that SMG, like all other members, by agreeing to the settlement, as conditioned on SMG's and perhaps other carriers' preserved rights to first-period adjustments, accepted its share of the Association's liabilities thereunder
 On the other hand, we do not feel that these petitions finally resolve the question of whether the Association's membership will face increased assessments as a result of the Commission's decision affirmed herein. Our rejection of the Association's argument that only PRG should face the responsibility for making good on SMG's claims does not signal our acceptance of SMG's diametrically opposed contention that the responsibility lies solely with the Association. A middle position exists under which the Association, after it reimburses SMG, may have corresponding rights to reimbursement from PRG. Because PRG's nonparticipation in this court leaves the record barren of the parties', and especially PRG's, understanding of how the SMG claims affected its side of the settlement, see note 15 supra, we are not in a position finally to resolve this issue.
 
 
 [24]
 Although, in deciding to join the Association, an employer accepts his share of its current liabilities, he is fully protected by section 15 once he does join. Hence, we cannot accept the Association's argument that the three SMG carriers no longer serving the Port of New York have, by leaving the Association, abandoned their already-accrued section 15 right to adjustments
 
 
 [25]
 All employer-members of the Association, of course, would have suffered had a strike not been averted by the conditional approval secured by the Association in 1970. It is not irrational, therefore, to expect that, in return for their freedom from a strike, the members would be willing to forego any rights to retroactive interest so long as they were assured that adjustment would be made on the principal parts of any overassessments occasioned by conditional approval. That they did forego interest until their rights were solidly determined is borne out by the facts that (a) the Commission never explicitly included the payment of interest among the duties imposed upon the Association by its conditional approval; (b) in the 1974 settlements with the automobile and newsprint interests that were also overassessed in the first period, the Association did not, nor was it asked to, pay interest; and (c) in its brief in this court, the States Marine Group itself identified 1972 as the time from whence interest should run, belying any claim to complete retroactivity to 1969. See note 26 infra
 It is true, as SMG has pointed out, that in 1970 none of the members anticipated that eight years would elapse before their rights were sorted out. It is equally true, however, as the Commission found, that all of the members involved in the dispute, including SMG, as well as the exigencies of the regulatory process under Volkswagenwerk and section 15, contributed to the length of time devoted to adjusting the parties' rights. No reason exists, therefore, to penalize the Association by overruling its members' acceptance in 1970 of the normal rule regarding the payment of interest only upon complete liquidation of their rights.
 
 
 [26]
 The Commission would have allowed SMG to recover interest after October 21, 1977 had the Association not complied with its decision by then. That date fell sixty days after the Commission finally computed the amount owed by the Association to SMG, as offset by the latter's share of the refunds made by the former to the automobile interests that were overassessed in the first period. See note 17 supra. SMG has argued to this court that it deserves interest from 1972, when the Commission determined that there was an as yet unliquidated liability owing to SMG. This argument ignores the fact that between 1972 and 1974 the validity of the Commission's decision was in doubt, pending appeal to this court, and that between 1974 and August 1977 time-consuming audits were necessarily being undertaken to determine the amount due SMG in adjustments as well as the offsetting amounts due the automobile interests. Hence, we agree with the Commission that not until late August of 1977 were the parties' rights fixed and that a 60-day compliance period thereafter free from interest is reasonable
 Because of our resolution of the issue, we need not address the Commission's argument that it always has discretion in awarding interest. The precedents it cites in favor of this position arose under section 22 of the Shipping Act, 46 U.S.C. § 821 (1970), under which the award of principal amounts is also within the agency's discretion. Hence, those citations do not appear to be controlling in cases arising under section 15, where, as here, the determination of the principal amounts owed does not lie so squarely within the Commission's discretion.