628 F.2d 253
 202 U.S.App.D.C. 253
 NEW YORK SHIPPING ASSOCIATION, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
Japan Line, Ltd., Kawasaki Kisen Kaisha, Ltd., Mitsui O. S.
K. Lines, Ltd., Nippon Yusen Kaisha, Yamashita-Shinnihon
Steamship Co., Ltd., Korea Shipping Corporation, D/S AF
1912, A/S and Svendborg, D/S A/S (Maersk Line), Intervenors.
ZIM-AMERICAN ISRAELI SHIPPING CO., INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
New York Shipping Assoc., Inc., Intervenor.
 Nos. 78-1479, 78-1871.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 7, 1980.
Decided July 30, 1980.
 
 Petition for Review of Order of the Federal Maritime commission.
 Donato Caruso, New York City, with whom C. P. Lambos, New York City, was on brief, for New York Shipping Association, petitioner in No. 78-1479 and intervenor in No. 78-1871.
 Allan J. Berdon, New York City, with whom Edwin Longcope and Frederick L. Shreves, II, Washington, D. C., were on brief, for Zim-American and Israeli Shipping Co., Inc., petitioner in No. 78-1871.
 Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Robert B. Nicholson, Barry Grossman and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.
 
 
 1
 Charles F. Warren and George A. Quadrino, Washington, D. C., also entered appearances for intervenor, Japan Line in No. 78-1479.
 
 
 2
 Seymour H. Kligler, New York City, also entered an appearance for intervenor Korea Shipping Corporation in No. 78-1479.
 
 
 3
 Carroll E. Dubuc, Washington, D. C., also entered an appearance for intervenor D/S AF 1912, A/S and Svendborg, D/S A/S in No. 78-1479.
 
 
 4
 Before McGOWAN and ROBINSON, Circuit Judges, and OBERDORFER,* United States District Judge for the District of Columbia.
 
 
 5
 Opinion for the court filed by Circuit Judge McGOWAN.
 
 McGOWAN, Circuit Judge:
 
 6
 In No. 78-1479, petitioner New York Shipping Association (the Association) seeks review of that part of an order of the Federal Maritime Commission (the Commission) which awards certain members of the Association refunds for overpayments made to the Association's employee-benefits fund. For reasons which appear below, we find that this aspect of the Commission's order was not legally defective, and we affirm it. In No. 78-1871, petitioner Zim-American Israeli Shipping Co., Inc., (Zim) seeks review of that part of the order which denies Zim refunds because of Zim's failure to file a timely claim. For reasons which appear below, we find that this aspect of the Commission's order was arbitrary and capricious, and we reverse it.
 
 
 7
 * For many years, the economic future of American ports was imperilled by chronic labor problems and the obsolescence of port facilities and practices.[1] Eventually, the future of these ports was assured by a series of agreements between labor unions and associations of employers. The essence of these agreements was that modern, mechanized methods should be instituted, and that employees should be secured against ensuing hardships by enhanced benefits. These benefits are paid out of special funds to which a port's employers contribute. Because the Supreme Court held in Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), that section 15 of the Shipping Act of 1916, 46 U.S.C. § 814, requires the employer associations to seek the Federal Maritime Commission's prior approval of agreements allocating the burdens of collectively bargained benefits, the administration of these funds is, in effect, supervised by the Commission. We now have before us the latest installment in a protracted dispute over the assessment of contributions to such a fund in the Port of New York.
 
 
 8
 The New York fund was established in 1968, when a fifty-seven day strike resulted in a collective bargaining agreement between the New York Shipping Association (the Port's employers' organization) and the longshoremen's union. The agreement covered 1969-1971 and, in keeping with the pattern of such agreements, it "assured longshoremen of considerably enhanced fringe and guaranteed-annual-income benefits." New York Shipping Association v. FMC, 571 F.2d 1231, 1234 (D.C. Cir. 1978). Members of the Association contributed to the fund from which these benefits were to be paid in proportion to the number of hours of longshore labor each member used. However, one group of carriers the States Marine Group protested that since its members handled cargo which could only be loaded in labor-intensive, unmechanized ways, assessment by the hour over-burdened them. By 1970, the union had come to fear that this disagreement over assessment methods jeopardized the fund. When the union warned of a second strike, the Association devised a compromise assessment agreement which used both man-hours and weight. The Commission approved the agreement conditionally, "subject to any and all adjustments and conditions as shall be ordered by the Commission in its final disposition of this proceeding."[2] Thus reassured, the ILA forbore to strike.
 
 
 9
 In 1972, the Commission, pursuant to its obligation under section 15[3] to decide the propriety of the agreement, determined that under the agreement the "Puerto Rican Group" of ocean carriers had been over -assessed, but that, for reasons not relevant here, it also had underpaid.[4] This court upheld the Commission's determination in Transamerican Trailer Transport v. FMC, 492 F.2d 617 (1974). The significant fact for the case at bar is that, since one group had underpaid, other members of the Association had overpaid.
 
 
 10
 By the time of the Commission's 1972 decision, the 1969-1971 agreement had expired, and the Association had had to use the conditionally approved formula for a second period. In this second period, the Puerto Rican group was not only over-assessed, it also overpaid. In 1974, the Association, apparently prodded by the union, sought to resolve at least some of these assessment difficulties by agreeing with the Puerto Rican Group "to offset the refunds due all other Association members from (the Puerto Rican Group) for the first period against those claimed by (the Puerto Rican Group) from the other members in the second period." New York Shipping Association v. FMC, 571 F.2d 1231, 1236 (D.C. Cir. 1978).
 
 
 11
 The agreement with the Puerto Rican Group was opposed by the States Marine Group, whose discontent with the original assessment plan had sparked the 1970 compromise plan. In its order approving the agreement with the Puerto Rican Group, the Commission acknowledged the States Marine Group's opposition to the agreement by ordering that that agreement "shall in no way affect or diminish the rights" of the States Marine Group.[5] Those rights were in fact not diminished, for on September 17, 1976, the Commission awarded the States Marine Group the refunds it sought from the Association,[6] an award this court approved in New York Shipping Association v. FMC (NYSA I), 571 F.2d 1231 (D.C. Cir. Jan. 13, 1978).
 
 
 12
 The Association was also aware, however, that the States Marine Group did not represent the only members who might feel they had overpaid and who thus might wish to seek refunds from the Association. Before the Board of Directors of the Association finally approved the agreement with the Puerto Rican Group, its counsel, Mr. C. P. Lambos, advised it of the
 
 
 13
 possibility that certain interests such as the break-bulk carriers may seek to recover amounts which they may claim are owing by the Puerto Rican carriers for the 1969-1971 period. In considering this agreement, therefore, this possibility must be weighed. NYSA and ILA counsel nevertheless recommend the proposal to their respective clients.
 
 
 14
 J.A. NYSA I 822a (emphasis added). This possibility was embodied in the Puerto Rican agreement itself, which stated that it was reached "as between the parties to this agreement, without regard to the continuance of said litigation by any other parties."[7]
 
 
 15
 In its order of September 17, 1976 (the same order in which the Commission awarded refunds to the States Marine Group), the Commission said that, "(s) ince only the States Marine Group, of all the potential recipients of refunds, has participated in this phase of the proceeding and pressed its claim here, it would be inappropriate to attempt to make any determinations with respect to the rights of others to refunds."[8] The Commission therefore announced that during the following sixty days "we will receive filings of claims on behalf of persons other than the members of the States Marine Group for assessment adjustments."[9] The Commission added that, "to insure that all possible claimants will be fully advised, we will publish in the Federal Register a notice of our action herein."[10] Id.
 
 
 16
 A number of members of the Association responded to the Commission's notice, and on April 3, 1978, the Commission ordered the Association to satisfy the claims of a list of members the Commission found to have properly qualified for refunds.[11] The Commission began by explaining that
 
 
 17
 (t)he mere facts that the additional claimants, unlike the States Marine Group, did not actively pursue their claims prior to the issuance of our Report and Order herein and were not specifically referred to in settlement agreements do not appear to us to constitute sufficient reasons to demonstrate a settlement, waiver, or agreement not to pursue their claims. As was true with respect to the States Marine Group, "nothing resembling a settlement has been produced on the record here, . . . (and) no such settlement has been approved by us as is required by section 15 of the Shipping Act and as was done with respect to the settlements with the other interests with which NYSA has reached agreements, i. e., the Puerto Rican carriers, newsprint, and automobiles." (Report and Order, pages 18-19.)[12]
 
 
 18
 The Commission dismissed the argument that the members of the Association had waived their claims when the Association made its agreement with the Puerto Rican Group:
 
 
 19
 Similarly, the Puerto Rican settlement cannot be said to bar the additional claims since the Puerto Rican settlement agreement "specifically recognized, as do the automobile and newsprint settlement agreements, the possibility of 'the continuance of . . . (the) litigation (in this proceeding) by other parties . . . " . . . Nor can activities of NYSA's Board of Directors act as a settlement or agreement not to pursue the additional claims, since such actions fall outside the scope of the Board's powers. . . .[13]
 
 
 20
 The Association now seeks review of the Commission's order that it satisfy the claims described above. Several of the claimants have intervened to ask the court to uphold the order.
 
 
 21
 The Zim-American Israeli Shopping Co., Inc. seeks review of another aspect of the Commission's order. It will be remembered that the Commission had announced on September 17, 1978, and shortly thereafter had reiterated in the Federal Register, that it would accept further claims only if they were filed within the following sixty days, i. e., by November 16, 1976. Zim did not file its claim by that date. On November 19, 1976, Zim requested an extension of filing time until December 31, 1976,[14] and on November 24, 1976, Zim filed its claim. In its April 3, 1978, order, the Commission denied Zim's claim as untimely filed. Zim seeks review of that denial; the Association has intervened in support of it.
 
 II
 
 22
 Our task here is a modest one. As we pointed out in NYSA I, the Commission itself "properly limits its function under Volkswagenwerk and section 15 to that essentially of a neutral arbiter seeking to assure that the parties acting independently have achieved a broadly equitable arrangement of benefits and burdens." 571 F.2d at 1238. We noted that "the role of this court is even more circumscribed." Id. As this court held in United States Lines v. FMC, 584 F.2d 519, 526 (D.C. Cir. 1978), in reviewing decisions of the Commission made under section 15 of the Shipping Act of 1916, we must ask whether the Commission's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. 706(2)(A). While our review must be "searching and careful," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), we may not substitute our judgment for the Commission's. 584 F.2d at 526.
 
 
 23
 The Association argues that the issue in this case is "purely one of basic corporate-agency and contract law," and that the preceding paragraph therefore describes too relaxed a standard of review. However, we do not agree that the Association accurately describes the issue. The order here under review was part of the Commission's continuing effort as a neutral arbiter to see to it that the compromise assessment agreement the Commission tentatively approved in 1970 will someday achieve that "broadly equitable arrangement of benefits and burdens" of which we spoke. The Commission's effort necessarily involves an exercise of the Commission's expertise, expertise which, as we observed in NYSA I, "rest(s) . . . heavily on the particular facts involved . . . ." 571 F.2d at 1237 n.15. To that expertise we must, of course, defer. As we have said before,
 
 
 24
 (T)he (Commission) . . . as an expert in the field and . . . this court should not pit its view against (it). The great complexity of our economy induced Congress to place the regulation of businesses like foreign shipments in specialized agencies with broad powers. The courts are slow to interfere with the conclusions of such agencies when reconcilable with statutory directions.
 
 
 25
 American Union Transport v. United States, 257 F.2d 607, 612 (D.C. Cir.), cert. denied, 358 U.S. 828, 79 S.Ct. 46, 3 L.Ed.2d 67 (1958), quoted in Transamerican Trailer Transport v. FMC, 492 F.2d 617, 624-25 (D.C. Cir. 1974).
 
 III
 
 26
 In New York Shipping Association v. FMC, No. 78-1479, we are sympathetic with the Association's argument that, sometime during the many years in which the assessments underlying this controversy have been in dispute, would-be claimants should, like the States Marine Group, have requested refunds for overpayments they may have made. Nevertheless, we cannot dismiss as arbitrary or capricious the Commission's decision that the claimants had not lost their rights to such refunds by the time the Commission announced that those rights were about to expire.
 
 
 27
 Although the Association's argument is couched in terms of waiver and estoppel, its gist is that the claimants, by not filing claims earlier, failed to resist appropriately the Association's assessment practices and thereby acquiesced in them. It is true that, in contrast to the States Marine Group, the claimants were not active in protecting their own interests. However, their conduct must be seen in light of the consistent inconclusiveness, as respects their claims, of the proceedings which led up to this litigation.
 
 
 28
 Those proceedings began with the Commission's highly conditional approval in 1970 of the compromise assessment formula which is the fountainhead of this whole series of disagreements. That approval was, as we reported above, "subject to any and all adjustments and conditions as shall be ordered by the Commission in its final disposition of this proceeding."[15] But that "final disposition" can in a practical sense be said to have been a process which has continued until the time of the presently controverted Commission order, as the Commission has attempted to work out "all adjustments and conditions" needed to make the final disposition a "broadly equitable" one.[16]
 
 
 29
 After the Commission had determined in 1972 that its conditional approval could not simply be made final, and after that determination had been approved by this court in Transamerican Trailer Transport v. FMC, supra, the Association made the crucial agreement with the Puerto Rican Group. For our purposes, the noteworthy fact about that agreement is that it seems to have expressed and sustained in the minds of all concerned the belief that events had not reached the point at which final decisions about presenting claims had to be made. True, the Commission specifically ordered that the agreement should "in no way affect or diminish the rights" of the States Marine Group. But by mentioning one set of claimants, the Commission did not bar all others, since the Commission approved the Puerto Rican agreement. Significantly, that agreement expressly stated that it was made "without regard to the continuance of said litigation by any other parties." When our court in NYSA I reviewed the Commission's order awarding refunds to the States Marine Group, we said that, "months before the Commission acted, the Board of Directors (of NYSA) evinced an awareness of the 'possibility that certain interests such as the break-bulk carriers (i. e. SMG) may seek to recover amounts which they may claim are owing by the Puerto Rican carriers for the 1969-1971 period.' " 571 F.2d at 1237 (quoting letter from the Association's counsel to the Board) (emphasis added). In NYSA I we also recited the agreement's provision for continued litigation by other parties, 571 F.3d at 1237 n.14, and explicitly left open the matter of "these other claims," 571 F.2d at 1237 n.15.
 
 
 30
 The Commission first treated the issue of rights to refunds on September 17, 1976, when it awarded the States Marine Group refunds it had sought. Significantly, it was in that first order devoted to the subject that the Commission moved to bring the issues to a close by announcing that claims would not be accepted unless they were filed within sixty days of the order.[17] In other words, as soon as the Commission could foresee the contours of its "final disposition" of these affairs, it cut off somewhat abruptly the right of theretofore silent claimants.
 
 
 31
 It was against this factual background that the Commission evaluated the reasonableness of the claimants' failure to file their claims before 1976. The Commission's task in this respect was not unlike the task of a jury in a negligence case when it is asked to evaluate behavior in terms of the "reasonable man" standard. Further, the Commission performed that task pursuant to its section 15 supervisory responsibilities and through the prism of its expert understanding of the issues involved. We must, then, defer to the Commission's judgment insofar as it is not arbitrary, capricious, or an abuse of discretion. The claimants' conduct may not have been wise. But, applying the standard described above, and viewing that conduct in light of the indications that the Association and the Commission anticipated further claims and in light of the Commission's duties under section 15, we cannot say that the Commission was arbitrary or capricious in seeing no "sufficient reasons to demonstrate a settlement, waiver, or agreement not to pursue their claims." We therefore affirm that portion of the Commission's order which directs the satisfaction of those claims approved by the Commission.[18]IV
 
 
 32
 We turn now to the commission case of Zim-American Israeli Shipping Co. v. FMC, No. 78-1871. Zim, it will be recalled, wished to file a claim against the Association pursuant to the Commission order we upheld above, but failed to file its claim by the Commission's deadline.
 
 
 33
 Zim makes two arguments. First, it asserts that it did not receive actual notice of the Commission's order setting a deadline on these claims, and that that order thus deprived it of a property interest (its claim) without constitutionally satisfactory notice. Second, it contends that the Commission's denial of its request for an extension of filing time was arbitrary and capricious. Since we uphold Zim's second argument, we need not consider its first.
 
 
 34
 Zim's contention that the Commission acted arbitrarily and capriciously rests on the following facts: Zim requested an extension on November 19, 1976 three days after the deadline and its request was denied; the Korea Shipping Corporation requested an extension on December 6, 1976, and its request was granted. (Zim filed its claim on November 24, 1976; Korea Shipping filed on January 13, 1977). On their face these facts suggest the Commission acted arbitrarily and capriciously, since it is irrational to treat similarly situated entities differently.
 
 
 35
 The Commission justifies its decision on two grounds. First, it says that Zim was treated no more unfavorably than two other claimants which had also requested extensions. This argument, of course, merely suggests that Zim was not the only firm treated arbitrarily. It does not speak to the disparate treatment afforded Zim and Korea Shipping.
 
 
 36
 Second, the Commission argues that Zim and Korea Shipping were not similarly situated because, unlike Korea Shipping, Zim waived its claims in its response to the so-called "Gunnarshaug poll." Gunnarshaug was a representative of the States Marine Group who, on July 16, 1974, apparently without the endorsement of either the Association or the Commission, circulated a poll to the members of the Association. In its brief the Commission describes that poll as
 
 
 37
 inquiring " as a matter of interest " how such NYSA members would vote with respect to refunds, "if a vote were taken today" and asking each such NYSA member to "vote either for direct cash refunds (or against them) by checking the relevant box at the foot of this letter." . . . The alternatives listed were: (1) "We vote that the funds collected be used for cash refunds to all carriers in proportion to their payments"; and (2) "We do not believe that cash refunds should be made, but that the funds should be deposited to the general fringe benefit accounts."
 
 
 38
 Respondents' Brief at 4-5 (emphases added). Zim voted for the second choice. However we cannot accept that even a negative response to this unofficial and professedly non-binding test of shipper opinion is properly construed as a waiver of or a failure to pursue a claim, especially when the poll itself was phrased in the highly conditional language we have italicized. We therefore reverse the Commission's determination that Zim is barred from filing its claim.
 
 
 39
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 See generally Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 295-306, 88 S.Ct. 929, 947-953, 19 L.Ed.2d 1090 (1968) (Douglas, J., dissenting); New York Shipping Ass'n v. FMC, 495 F.2d 1215 (2d Cir.), cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974); Transamerican Trailer Transport, Inc. v. FMC, 492 F.2d 617 (D.C. Cir. 1974)
 
 
 [2]
 Conditional Approval of Agreement 2390 (March 11, 1970) (unpublished). "The Association assented to any 'modification as determined by the Commission' and agreed to make 'all adjustments . . . retroactive( ).' " New York Shipping Ass'n v. FMC, 571 F.2d 1231, 1235 n.4 (D.C. Cir. 1978)
 
 
 [3]
 In relevant part, section 15 of the Shipping Act of 1976, 46 U.S.C. § 814, states:
 Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.
 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. . . .
 
 
 [4]
 Cooperative Working Arrangement, 15 F.M.C. 259 (1972)
 
 
 [5]
 Approval with Condition of Agreement No. T-3017 (Jan. 16, 1975) (unpublished), reprinted in New York Shipping Ass'n v. FMC, 571 F.2d 1231, 1236-7 (D.C. Cir. 1978)
 
 
 [6]
 Agreement No. T-2336 New York Shipping Association Cooperative Working Arrangement, Report and Order, (Sept. 17, 1976) (unpublished), reprinted in J.A. at 59a
 
 
 [7]
 Agreement No. T-3017 at 1 (Jan. 16, 1975) (unpublished) (emphasis added)
 
 
 [8]
 Agreement No. T02336 New York Shipping Association Cooperative Working Agreement, Report and Order at 25, reprinted in J.A. at 83a
 
 
 [9]
 Id. at 27, reprinted in J.A. at 85a
 
 
 [10]
 Id
 
 
 [11]
 Order Determining Amount and Directing Satisfaction of Remaining Valid Claims, (unpublished) reprinted in J.A. at 161a-187a
 
 
 [12]
 Id. at 7, reprinted in J.A. at 167a
 
 
 [13]
 Id. at 8, reprinted in J.A. at 168a. The Commission also adverted to adjustments the Association had made without objection for automobile carriers and concluded that "making such adjustments for automobile carriers while failing to make them for similarly situated additional claimants here would appear to constitute unjust discrimination." Id. at 9, reprinted in J.A. at 169a
 
 
 [14]
 Letter from John Fisher, Controller, Zim-American Israeli Shipping Co., Inc., to New York Shipping Association (carbon copy to Federal Maritime Commission), November 19, 1976, reprinted in J.A. (Zim ) at 79a:
 This is to serve notice of our intention to file claim for refund of overpaid tonnage assessment for the period October 1, 1969-September 20, 1971 in conjunction with Federal Maritime Commission ruling dated September 17, 1976.
 Because of the volume of material needed to be researched to substantiate our claim, we hereby request extention (sic ) of filing time until December 31, 1976. Kindly confirm granting of the extention (sic ) by return.
 
 
 [15]
 Conditional Approval of Agreement 2390 (March 11, 1970) (unpublished), quoted in NYSA I, 571 F.2d at 1235 n.4
 
 
 [16]
 See n.2 and accompanying test supra
 
 
 [17]
 See text at notes 6-10 supra
 
 
 [18]
 The Association contends that, when its Board of Directors approved the Puerto Rican Agreement, it waived on behalf of its members all claims they might make in respect to the compromise assessment formula. In view of our conclusion that the Puerto Rican agreement did not foreclose such claims, we can best respond to this contention by quoting our response to a similar contention made to us in NYSA I :
 The Association also has insisted that, pursuant to its bylaws, its members are bound by majority votes of its Board of Directors, and that SMG accordingly is bound by the Board's unanimous decision not to pursue further claims against PRG. Aside from the fact that the bylaw relied upon by Association in this respect appears not to cover the board's votes on the matters relevant in this case, it appears that the board voted merely to approve the settlement despite the possibility it would not resolve the SMG claims. Finally, the legal rule requiring courts to honor bylaws binding upon litigants recognizes a public-interest exception implicated by the Commission's exemption, on public policy grounds, of SMG from the terms of the settlement. E. g., Haebler v. New York Product Exchange, 149 N.Y. 414, 427, 44 N.E. 87, 91 (1896).
 571 F.2d at 1239 n.18 (citation omitted) (emphasis original).